**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JOSE MIGUEL JAIMES HERNANDEZ,

                    Petitioner,

          -against-

THOMAS DECKER ET AL.

                    Respondents.

18-CV-5026 (ALC)

**OPINION AND ORDER**
**GRANTING WRIT OF**
**HABEAS CORPUS**

**ANDREW L. CARTER, JR., United States District Judge:**

Under 8 U.S.C. § 1226(c), the Government must detain a limited class of noncitizens without bond for the brief period pending removal proceedings. This case is about how long that period lasts before due process requires the Government to justify continued detention by showing that the noncitizen is a flight risk or danger to his community. Jose Miguel Jaimes Hernandez ("Jaimes") is a 39-year-old father of seven U.S. citizen children who has lived in the United States for approximately 21 years, detained without bond by Immigration and Customs Enforcement ("ICE") for the last nine months while contesting his removal in administrative proceedings. He petitions this Court for a writ of habeas corpus in an effort to obtain a bond hearing with an Immigration Judge ("IJ") or his immediate release. Because Jaimes's detention has been unreasonably prolonged, the Court grants the portion of his petition seeking an individualized bond hearing, and orders that Respondents provide him with such hearing within seven days of this order.

## I.      Factual and Procedural History

### a.   Arrest and Detention under 8 U.S.C. § 1226(c)

Jaimes was born in Mexico on March 24, 1977. Petition ("Pet.") ¶ 35 (ECF No. 1). At approximately 18 years old, he left his hometown for the United States in order to escape poverty

and financially support his parents and then three-year-old daughter. Id. He entered the United States without being admitted or paroled and has never left. Id. ¶¶ 34, 36; Declaration of Deportation Officer Joseph T. Pujol ("Pujol Decl.") ¶ 3 (ECF No. 24). Over the last 21 years living here, Jaimes has developed extensive family ties, including his seven U.S. citizen children (ranging from one-year-old to 17-years-old) and two-month-old granddaughter, all of whom rely on him for financial and emotional support. Pet. ¶¶ 37, 55; Declaration of Alina Charniauskaya ("Charniauskaya Decl.") ¶ 9 (ECF No. 29-1).[1]

At the time of his arrest by ICE, Jaimes lived primarily with his three youngest children and their mother, with whom he has had a long-term relationship. Pet. ¶¶ 1, 56. In addition, he took many of his children to school each day, and was an active parent at their schools. Id. ¶ 56. He worked at a pizzeria prior to his arrest and was the primary financial provider for his partner and three younger children, but also supported his four older children. Id. ¶ 59. Jaimes also regularly sent money to Mexico for his father, who suffers from life-threatening diabetes, so that he would be able to afford his medication. Id. ¶ 35. Both he and his family actively participate in their church. Id. ¶ 55.

Between 2001 and 2006, Jaimes picked up five criminal convictions, none of which were for violent offenses. Id. ¶ 38; see Pet. Ex. 1 at 64-70 (criminal history chart and disposition certificates). For his five convictions, he never served any time in jail and his most recent arrest resulting in a conviction was November 30, 2006. Id.[2] Three of these offenses–specifically, Jaimes's 2003 convictions for fourth-degree promoting prostitution (N.Y. Penal Law § 230.20),

---

[1] Jaimes also has one non-biological child for whom he has acted as a father figure since before she was born, as well as a biological daughter who was born in, and remains in, Mexico. Id.

[2] Jaimes's fifth conviction was for disorderly conduct (N.Y. Penal Law § 240.20), for which he was sentenced, on February 28, 2005, to a $250 fine. In addition, on August 1, 2017, Jaimes was arrested for, inter alia, attempted robbery in the second degree (N.Y. Penal Law §§ 110-160.10). Those charges were dismissed on February 6, 2018.

attempted third-degree promoting prostitution (N.Y. Penal Law §§ 110-230.25), and attempted second-degree criminal possession of a forged instrument (N.Y. Penal Law §§ 110-170.20)–are alleged to be crimes involving moral turpitude ("CIMT") under the Immigration and Nationality Act ("INA") and, as such, to warrant Jaimes's mandatory detention under 8 U.S.C. § 1226(c).

On October 24, 2017, ICE agents arrested Jaimes on a Form I-200 warrant and transferred him to the Bergen County Jail in Hackensack, New Jersey. Id. ¶ 25. ICE charged Jaimes with removability pursuant to Immigration and Nationality Act ("INA") § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i) as an alien present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General. Pet. ¶ 31; Return Ex. A at 1 (Notice to Appear ("NTA")) (ECF No. 22). Since his arrest just over nine months ago, ICE has detained Jaimes without bond at Bergen County Jail pursuant to INA § 236(c), 8 U.S.C. § 1226(c). Return Exs. D-E; Pujol Decl. ¶¶ 3, 7. Section 1226(c) mandates detention without bond until the conclusion of removal proceedings of a noncitizen who "is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii)"–i.e., CIMT's. Id. Conditions at the Bergen County Jail for immigrant detainees are "identical to conditions for individuals being held in criminal custody." Charniauskaya Decl. ¶ 13; see Declaration of Ryan O'Dell ("O'Dell Decl.") ¶ 3 (ECF No. 29-1 at pp. 111-12). But see Declaration of Supervisory Detention and Deportation Officer Thomas M. Flynn ("Flynn Decl.") ¶¶ 4-6 (ECF No. 30-1) (indicating that the jail "adhere[s] to ICE detention standards, which are separate from any standards established by Bergen County," and that inmates and detainees rarely commingle, but not providing any facts indicating that conditions are different).

During this time, each of Jaimes's children have experienced medical issues, including depressive symptoms, and seen their grades deteriorate. Pet ¶ 57. This is particularly problematic

for two of Jaimes's children who are enrolled in the Individualized Education Program. Id. More specifically, one of Jaimes's sons has been diagnosed with Post-Traumatic Stress Disorder and one of his daughters has expressed suicidal ideation. Id. ¶¶ 10, 12. These two children have waited for months to see a therapist due to the family's inability to pay for one. Id. ¶ 15. His son has also developed high cholesterol and hypertension, which his doctor has indicated is a result of stress. Id. ¶ 11.

In addition, since Jaimes's arrest, his family has faced extreme financial hardship; they are facing eviction from their apartment and are unable to pay for basic necessities. Id. ¶ 60. While in immigration detention, Jaimes has struggled to obtain adequate care for his diabetes and arthritis. Id. ¶ 61. Having not obtained the necessary injections for his conditions for the first three months of his detention, Jaimes has suffered swelling that limited his movement in his forearm and causes him pain in his arm to this day. Id. His detention has also had a severe impact on his father's medical condition as he cannot afford his medication for diabetes and is losing his eyesight as a result. Id. ¶ 62.

    *b. Timeframe of removal proceedings*

Jamies's first hearing in his removal proceedings took place on November 27, 2017, over one month after his arrest by ICE. Pet. ¶ 45; Pujol Decl. ¶ 8. At that hearing, Jaimes denied the factual allegations and the charge of removability in the NTA, and the Department of Homeland Security ("DHS") did not provide evidence prior to pleadings being conducted, a new policy at the time. Id.; Charniauskaya Decl. ¶ 14; Declaration of Khalilah Taylor ("Taylor Decl.") ¶ 8 (ECF No. 30-3). At a second hearing on January 17, 2018, Jaimes moved to terminate the proceedings, arguing that DHS' evidence did not establish his alienage by clear, unequivocal, and convincing evidence, and that his Mexico Consular ID card should be suppressed as a product of violations of

the Fourth and Fifth Amendments and the pertinent regulations. Pet. ¶ 46 & Ex. 6; Pujol Decl. ¶ 9. DHS filed a response to the motion on February 9, 2018, having obtained a one-week extension. Pet. ¶ 46; Pujol Decl. ¶ 10. Jaimes also sought a bond redetermination hearing on January 17, 2018, but the IJ declined, stating that, under Lora v. Shanahan (discussed infra), an insufficient amount of time had accrued for Jaimes to obtain a bond hearing. Pet. ¶ 47. Instead, he scheduled a Lora bond hearing on March 28, 2018.

On February 21, 2018, Jaimes appeared at a third hearing at which the IJ adjourned the case to March 28, 2018. Pujol Decl. ¶ 11. On March 26, 2018, Jaimes filed a brief arguing that, because his 2003 convictions are not CIMTs, he was improperly designated as subject to mandatory detention, and thus was entitled to a custody redetermination hearing. Pet ¶ 48 & Ex. 1; Pujol Decl. ¶ 12.[3] On March 28, 2018, Jaimes appeared for another hearing, at which the IJ orally denied his motion to terminate and suppress. Pet. ¶ 49; Pujol Decl. ¶ 13. The judge also scheduled a hearing on bond eligibility for May 2, 2018[4] as well as a merits hearing on June 6, 2018. Pet. ¶ 51; Pujol Decl. ¶ 13. That same day, Jaimes submitted his Form I-589, Application for Asylum and Withholding of Removal, as well as an EOIR-42B Application for Cancellation

---

[3] The Board of Immigration Appeals ("BIA"), the administrative body charged with interpreting the INA, defines a CIMT as one that involves "'conduct that shocks the public conscience as being inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general.'" Wala v. Mukasey, 511 F.3d 102, 105-06 (2d Cir. 2007) (citing In re M-, 2 I. & N. Dec. 721, 723 (B.I.A.1946)). To assess whether a conviction is in fact for a CIMT, the BIA is required to use a categorical approach that "'look[s] to the elements and the nature of the offense of conviction, rather than to the particular facts relating to [the] petitioner's crime.'" Wala, 511 F.3d at 107 (citing Canada v. Gonzales, 448 F.3d 560, 565 (2d Cir. 2006); Dalton v. Ashcroft, 257 F.3d 200, 204 (2d Cir. 2001)).

[4] IJs are prohibited from releasing an individual detained pursuant to Section 1226(c). 8 C.F.R. § 1003.19(h)(2)(i)(D). However, a person detained under that authority may request a hearing before an IJ to assess whether he or she is actually subject to mandatory detention under the statute. See 8 C.F.R. § 1003.19(a), (b), and (h)(2)(ii); Matter of Joseph, 22 I. & N. Dec. 799 (BIA 1999). Such a hearing, known as a Joseph hearing, charges ICE with the initial burden of showing there is "reason to believe" that the detained alien is deportable or admissible under a ground listed in Section 1226(c)(1)(A)-(D). Id. at 803-04; see Matter of U- H-, 23 I. & N. Dec. 355, 356 (BIA 2002) ("reason to believe" standard is equivalent to "probable cause" standard). Once ICE has carried that burden, an individual "may avoid mandatory detention by demonstrating that he is not an alien, was not convicted of the predicate crime, or that [ICE] is otherwise substantially unlikely to establish that he is in fact subject to mandatory detention." Demore v. Kim, 538 U.S. 510, 514 n.3 (2003) (citing, inter alia, Joseph).

of Removal for Nonpermanent Residents. Pet. ¶ 50 & Exs. 4 & 7; Charniauskaya Decl. ¶ 10.

On May 2, 2018, the IJ denied Jaimes's bond request, finding him properly detained on the basis of his convictions and thus statutorily ineligible for bond. Pet. ¶ 53; Return Exs. F, H; Pujol Decl. ¶ 15. Jaimes appealed that decision to the BIA. Return Ex. G. On June 6, 2018, Jaimes appeared before an IJ for an individual hearing, but the IJ did not have sufficient time to complete the case and adjourned the hearing to July 27, 2018. Pujol Decl. ¶ 17. The same day, Jaimes filed the instant petition. As of July 18, 2018, the IJ had not issued any decision on Jaimes's applications. Petitioner's Supplemental Letter Brief ("Supp. Ltr.") at 1 (ECF No. 29); Charniauskaya Decl. ¶ 5.

At the July 27, 2017 hearing, Jaimes will likely appear by video teleconference, a new procedure for detained cases pending before the Executive Office of Immigration Review at 201 Varick Street, New York, NY 10014. Charniauskaya Decl. ¶¶ 3-4. Counsel has indicated that it is unlikely the Court will be able to conclude the hearing and close the record on this date, because the new videoconference procedure has frequent technical issues. Id. ¶ 7. Further, because the IJ has not issued a decision with regard to eligibility in applying for cancellation of removal, it is "even more unlikely" that the hearing will be completed on that date. Id.

Assuming Jaimes's hearing goes forward on July 27, 2018, counsel will argue he is eligible to pursue his Cancellation Application, under both statutory and discretionary requirements. Charniauskaya Decl. ¶¶ 5-6. He will present arguments, as well as oral testimony from three experts in support, that his convictions under N.Y. Penal Law § 230.20 and §§ 110-230.25(1) are categorically not CIMTs. Id. Jaimes also intends to present testimony in support of his Asylum Application. Id.

## II.    Discussion

### a.    The Court has jurisdiction over Jaimes's habeas petition.

The general habeas corpus statute, set forth at 28 U.S.C. § 2241, "authorizes a district court to grant a writ of habeas corpus whenever a petitioner is 'in custody in violation of the Constitution or laws or treaties of the United States.'" Wang v. Ashcroft, 320 F.3d 130, 140 (2d Cir. 2003) (quoting 28 U.S.C. § 2241(c)(3)).    Under this provision, federal courts are empowered to hear claims by non-citizens challenging the constitutionality of their detention.    Demore, 538 U.S. at 516-17.

The government does not dispute jurisdiction in this case and it exists under 28 U.S.C. §§ 2241 (habeas) and 1331 (federal question). The INA bars federal courts from reviewing challenges to an IJ's discretionary decision regarding detention and bond. 8 U.S.C. § 1226(e); see Chen v. United States Dep't of Justice, 434 F.3d 144, 153 n.5 (2d Cir. 2006).    But Jaimes instead challenges the constitutionality of "the statutory framework that permits his detention without bail." Demore, 538 U.S. at 517. The Court has jurisdiction to hear that challenge. Id.

### b.    Legal background

"It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." Reno v. Flores, 507 U.S. 292, 306 (1993). It is equally undisputed that "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Fifth Amendment's Due Process] Clause protects." Zadvydas v. Davis, 533 U.S. 678, 690 (2001). Nonetheless, under certain circumstances, the Supreme Court "has recognized detention during deportation proceedings as a constitutionally valid aspect of the deportation process." Demore, 538 U.S. at 523.

The INA provision that ordinarily governs detention during removal proceedings, 8 U.S.C.

§ 1226(a), commits to the Attorney General's discretion whether to detain a respondent during removal proceedings "[e]xcept as provided in subsection (c). . . ." The Section 1226(c) exception mandates that "[t]he Attorney General shall take into custody any alien who . . . is deportable by reason of having [two convictions for CIMTs not arising out of a single scheme of criminal misconduct] . . . when the alien is released" from criminal incarceration underlying the Government's charge of removability.

In <u>Demore</u>, a lawful permanent resident who had been convicted of two CIMTs and conceded his removability brought a facial constitutional challenge to Section 1226(c). <u>Id.</u> at 510. The District Court found the statute facially unconstitutional and the Ninth Circuit narrowed that holding as applicable only to LPRs. <u>Kim v. Ziglar</u>, 276 F.3d 523, 526 (9th Cir. 2002), <u>rev'd sub nom.</u> <u>Demore v. Kim</u>, 538 U.S. 510. On appeal, the Supreme Court reversed, holding that Congress "may require that persons such as respondent be detained for the brief period necessary for their removal proceedings." <u>Demore</u>, 538 U.S. at 513. By "persons such as respondent," the Court specified that it referred to "a criminal alien who has conceded that he is deportable." <u>Id.</u> at 531. The "brief period" envisioned by the Court "lasts roughly a month and a half in the vast majority of cases" and "about five months in the minority of cases in which the alien chooses to appeal." <u>Id.</u> at 530. The <u>Demore</u> petitioner himself, who had filed for habeas after three months of detention and was released upon order of the District Court after six months, also fell within that period. <u>Id.</u> at 531, n.15.

<u>Demore</u> discussed and distinguished <u>Zadvydas</u>, a prior Supreme Court holding on the constitutionality of immigration detention. <u>Zadvydas</u> dealt not with Section 1226(c) detention during removal proceedings, but with 8 U.S.C. § 1231, which allows the Government to detain a noncitizen without bond beyond the 90 days following a final order of removal if for the purpose

of facilitating actual removal from the United States. 533 U.S. 678. The <u>Zadvydas</u> petitioners had been ordered removed, but when no other country would accept them, the Government interpreted Section 1231 to authorize their indefinite detention. <u>Id.</u> at 684-87. To avoid the serious Due Process Clause concerns raised by that interpretation, the Court construed the statute to contain an implicit six-month limit to detention without bond for a noncitizen under a final order of removal whose actual removal is not reasonably foreseeable. <u>Id.</u> at 690, 701. The <u>Zadvydas</u> holding rested on the premise that when "detention's goal is no longer practically attainable, detention no longer bears a reasonable relation to the purpose for which the individual was committed." <u>Demore</u>, 538 U.S. at 527 (citing <u>Zadvydas</u>, 533 U.S. at 690). Unlike the indefinite, post-removal order Section 1231 detention in <u>Zadvydas</u> which could no longer facilitate the petitioners' actual removal, the limited Section 1226(c) detention pending removal proceedings in <u>Demore</u> was facially constitutional because it was reasonably related to its purpose: "preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed." <u>Demore</u>, 538 U.S. at 528.

While the <u>Demore</u> majority opinion upheld the constitutionality of Section 1226(c) both facially and as applied specifically to the respondent, Justice Kennedy's concurrence briefly addressed the circumstances under which that conclusion could change.

> [S]ince the Due Process Clause prohibits arbitrary deprivations of liberty, a lawful permanent resident alien such as respondent could be entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or unjustified. . . . Were there to be an unreasonable delay by the INS in pursuing and completing deportation proceedings, it could become necessary then to inquire whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons.

<u>Demore</u>, 538 U.S. at 532-33 (Kennedy, J., concurring).

Thus, under Justice Kennedy's analysis, when detention under Section 1226(c) is unreasonable or

unjustified, a bond hearing is required. The surest sign of unreasonable detention is unreasonable delay by the Government in pursuing and completing removal proceedings.

Since Demore, numerous judges in this District concluded that mandatory detention beyond six months to a year violates the Due Process Clause of the Constitution. See, e.g., Faure v. Decker, No. 15-CV-5128 (JGK), 2015 WL 6143801, at *2-4 (S.D.N.Y. Oct. 19, 2015); Minto v. Decker, 108 F. Supp. 3d 189, 195-96 (S.D.N.Y. 2015); Gordon v. Shanahan, No. 15-CV-261 (JGK), 2015 WL 1176706, at *3-5 (S.D.N.Y. Mar. 13, 2015). The Second Circuit subsequently agreed that such detention presented serious constitutional concerns, reasoning that, as a matter of constitutional avoidance (citing Zadvydas), mandatory detention under Section 1226(c) without a bond hearing must be viewed as limited to six months, after which a noncitizen is entitled to a hearing at which the Government must prove, by clear and convincing evidence, that continued detention is required. Lora, 804 F.3d 601; see Rodriguez v. Robbins, 715 F.3d 1127, 1132-33 (9th Cir. 2013) (adopting similar six-month bright-line rule). The Lora Court suggested that a bright-line rule of six months was necessary because of "the pervasive consistency and confusion exhibited by district courts in this Circuit when asked to apply a reasonableness test on a case-by-case basis." Id. at 615 (further reasoning that courts within the Circuit had particularly heavy immigration dockets). Other circuit courts of appeals also weighed in, concluding that detentions under Section 1226(c) should be assessed through an individualized reasonableness inquiry (as opposed to a bright-line rule). See, e.g., Sopo v. U.S. Attorney Gen., 825 F.3d 1199, 1215 (11th Cir. 2016), vacated on other grounds, 890 F.3d 952 (11th Cir. 2018); Diop v. ICE/Homeland Sec., 656 F.3d 221, 234-35 (3d Cir. 2001).

Recently, in Jennings v. Rodriguez, 138 S. Ct. 830 (2018), the Supreme Court concluded that the Ninth Circuit had erred in applying the canon of constitutional avoidance to Section

1226(c), and reversed the Ninth Circuit's bright-line rule.  Holding that Section 1226(c) unambiguously mandated detention for certain classes of individuals, the Court distinguished Zadvydas as having concerned a statute that was ambiguous, thus triggering the application of the constitutional-avoidance canon.  Jennings, 138 S. Ct. at 843-46.  The Court vacated the Ninth Circuit's decision but remanded the case "to consider respondents' constitutional arguments on their merits." Id. at 851.[5]  Because the Lora decision also relied upon the Zadvydas constitutional avoidance analysis, the Supreme Court also vacated Lora after Jennings was issued.  Shanahan v. Lora, 138 S. Ct. 1260 (2018).  On remand, the Second Circuit dismissed the case as moot because Mr. Lora had been granted cancellation of removal.  Lora v. Shanahan, 719 F. App'x 79, 80 (2d Cir. 2018).

Since then, it appears that only one court within this Circuit has examined the extent to which the constitutional overtones of Lora remain good law, concluding that "the reasoning of Lora remains strong persuasive authority[,]" though not binding.  Sajous v. Decker, 18-CV-2447 (AJN), 2018 WL 2357266, at *7 (S.D.N.Y. May 23, 2018).  However, as Judge Nathan further reasoned, irrespective of Lora, it remains clear, under Justice Kennedy's concurrence in Demore, as well as a wealth of other precedent, that "prolonged mandatory detention under § 1226(c), under certain circumstances . . . , can become unreasonable such that an alien is entitled to an individualized determination as to his risk of flight and dangerousness."  Sajous, 2018 WL 2357266, at *9 (quoting Demore, 538 U.S. at 532 (Kennedy, J., concurring)).  After concluding that a bright-line six-month rule was not constitutionally mandated, Judge Nathan applied a

---

[5] In dissent, Justice Breyer, joined by two other Justices, argued that any reading of the statute that forecloses a bond determination to detained individuals "at the very least would raise 'grave doubts' about the statute's constitutionality." Id. at 861 (Breyer, J., dissenting); see id. at 862-69 (discussing the constitutional text and history that supports necessity of individualized bail determination). The majority took no position on the dissent's detailed constitutional analysis. Id. at 851.

circumstance-specific approach to conclude that the Mr. Sajous was deprived of procedural due process after having been detained for nine months in a New Jersey prison facility without an individualized bond hearing. Id. at *9-*12.

In this case, Jaimes argues that under Justice Kennedy's analysis in Demore, his detention without a bond hearing has become unreasonably prolonged, whether the Court applies a bright-line rule or conducts an as-applied reasonableness analysis. The Court agrees.[6]

> c. *The standard for assessing an unreasonably prolonged period of detention under Section 1226(c)*

As discussed above, the Lora decision, which remains "strong persuasive authority" in this Circuit, Sajous, 2018 WL 2357266, at *7, required an individualized bond hearing after six months of detention, a standard which Jaimes indisputably would meet. Lora, 804 F.3d at 615. Since Demore, the numerous circuit courts that have declined to establish a bright-line rule have addressed a number of considerations for when Section 1226(c) detention becomes unreasonably prolonged. The Sixth Circuit rule, succinctly stated, is "when actual removal is not reasonably foreseeable, criminal aliens may not be detained beyond a reasonable period required to conclude removability proceedings without a government showing of a 'strong special justification,' constituting more than a threat to the community, that overbalances the alien's liberty interest." Ly

---

[6] Jaimes presents at least three other arguments as to why he is entitled to a bond hearing, alleging both violations of the INA, the Fourth Amendment, and procedural and substantive due process. Pet. ¶¶ 114-15, 118. First, because Section 1226(c) applies only to a noncitizen who is detained by ICE "when . . . released" from previous criminal incarceration, it does not apply to someone who was detained after a significant gap from release. Jaimes cites to the multi-year gap between his last arrest/conviction and his detention by ICE. Courts in this district are split as to whether the "when . . . released" clause requires that ICE detain at, around, or within a reasonable time after release from criminal custody or whether it may do so at any point after release. Though the Second Circuit rejected this argument in Lora, 804 F.3d at 613, certiorari has been granted to address a circuit split on this question. Preap v. Johnson, 831 F.3d 1193, 1207 (9th Cir. 2016), cert. granted sub nom, Nielsen v. Preap, 138 S. Ct. 1279 (2018). In addition, Jaimes argues that his arrest and prolonged separation from his family violates his substantive due process rights, and that his arrest without probable cause violated his Fourth Amendment rights. Because the Court finds that Jaimes's detention is unreasonably prolonged, it declines to address each of these arguments. Though Jaimes appears to vaguely request that the Court "order immediate release[,]" Pet. at 38, the Petition has failed to identify which claim would entitle him to such relief, nor is such a claim apparent to the Court.

v. Hansen, 351 F.3d 263, 273 (6th Cir. 2003). Factors that address whether the detention period is reasonable include the comparative length of a respondent's criminal and immigration incarceration, whether the respondent's detention is reasonably related to the statute's goals, whether the Government has "drag[ged] its heels" in the removal proceedings, and whether the respondent has engaged in dilatory tactics. Id. at 271-272.

The Third Circuit rule "authorizes detention for a reasonable amount of time, after which the authorities must make an individualized inquiry into whether detention is still necessary to fulfill the statute's purposes of ensuring that an alien attends removal proceedings and that his release will not pose a danger to the community." Diop v. ICE/Homeland Sec., 656 F.3d 221, 231 (3d Cir. 2011). Factors defining a reasonable amount of time include whether the respondent has been detained "for significantly longer than" the brief period of a month and a half to five months mentioned in Demore. Id. at 233-34. Recently, the Third Circuit characterized nine months as "straining any common-sense definition of a limited or brief civil detention." Chavez-Alvarez v. Warden York Cty. Prison, 783 F.3d 469, 477 (3d Cir. 2015).

In addition to the sheer length of detention, the Third Circuit looks for "errors in the proceedings that cause unnecessary delay." Diop, 656 F.3d at 234. Such delay, even if attributable to innocent mistakes that are individually reasonable, "can nevertheless result in the detention of a removable alien for an unreasonable, and ultimately unconstitutional, period of time." Id. at 223. Moreover, where a respondent's challenge to his removability presents real issues—"for example: a genuine factual dispute; poor legal reasoning; reliance on a contested legal theory; or the presence of a new legal issue"—delay attributed to contesting those issues "does not undermine his ability to claim that his detention is unreasonable." Chavez-Alvarez, 783 F.3d at 477.

Similarly, the Eleventh Circuit has concurred that, when detention approaches the one-year

mark without an individualized bond hearing, it "may often become unreasonable[.]" Sopo, 825

F.3d at 1217 (citations omitted). While the party responsible for delay is also pertinent, courts

should keep in mind that "aliens should not be punished for pursuing avenues of relief and

appeals[,]" but evidence of bad faith delays may cut against them. Id. at 1218 (citations omitted).

Further considerations include whether removal is possible after there is a final order of removal,

whether the alien's time in immigration detention exceeds the time the alien spent in prison for the

removable offense(s), and whether the facility in which the alien is detained is "meaningfully

different" from a penal institution. Id. (citations omitted).

The First Circuit emphasized the same factors, and, like the Sixth Circuit, has placed weight

on the foreseeability of proceedings concluding in the near future, reasoning that:

> As Justice Kennedy noted in his Demore concurrence, the government's
> categorical denial of bond hearings is premised upon the alien's presumed
> deportability and the government's presumed ability to reach the removal
> decision within a brief period of time. In other words, there is a difference
> between the "foreseeability" of proceedings ending and the "foreseeability" of
> proceedings ending adversely. As the likelihood of an imminent removal order
> diminishes, so too does the government's interest in detention without a bond
> hearing.
>
> Thus, a court looking to measure the reasonableness of continued
> categorical detention must examine the presumptions upon which that
> categorical treatment was based (such as brevity and removability). As the
> actualization of these presumptions grows weaker or more attenuated, the
> categorical nature of the detention will become increasingly unreasonable.

Reid v. Donelan, 819 F.3d 486, 499-500 (1st Cir. 2016) (citations omitted).

Aside from Lora, the Second Circuit has yet to speak on when detention becomes

unreasonably prolonged. Prior to Lora, district courts in this Circuit almost all opted for a fact-

dependent inquiry. See Johnson v. Orsino, 942 F. Supp. 2d 396, 407 (S.D.N.Y. 2013) (finding

detention not unreasonably prolonged under fact-dependent inquiry). But see Gordon, 2015 WL

1176706, at *4 (prolonged detention unconstitutional under both a six-month bright-line test and

a fact-dependent inquiry). In <u>Sajous</u>, Judge Nathan distilled these considerations down to five essential factors: (1) the length of time the alien has been detained; (2) whether the alien is responsible for the delay; (3) whether the alien has asserted defenses to removal; (4) whether the alien's civil immigration detention exceeds the time the alien spent in prison for the crime that rendered him removable; and (5) whether the facility for the civil immigration detention is meaningfully different from a penal institution for criminal detention. 2018 WL 2357266, at *10-*11 (citations omitted).

In his petition, Jaimes presents arguments for a bright-line rule as well as under a fact-dependent inquiry. The Court need not decide which test is appropriate, however, because under both a bright-line rule and a fact-dependent inquiry, Jaimes's detention has become unreasonably prolonged. See <u>Gordon</u>, 2015 WL 1176706, at *4 (detention unreasonably prolonged under both a six-month bright-line test and a fact-dependent inquiry).[7]

    *d. Jaimes's Section 1226(c) detention is unreasonably prolonged.*

Examination of the facts and circumstances of this case shows that Jaimes's detention is

---

[7] The government argues that Jaimes's having received a <u>Joseph</u> hearing, subject to appellate review by the BIA, is sufficient due process. Respondents' Memorandum of Law in Opposition to the Petition for a Writ of Habeas Corpus ("Gov't Br.") at 17-19 (ECF No. 23). The Court disagrees. The applicable standard in a <u>Joseph</u> hearing requires an individual to demonstrate that the Government is "substantially unlikely to establish" the charges that subject him to mandatory detention, and thus a <u>Joseph</u> inquiry does not involve an analysis of risk of flight or dangerousness, which Justice Kennedy's <u>Demore</u> concurrence itself suggests is the appropriate inquiry. <u>Joseph</u>, 22 I. & N. Dec. at 806; <u>see</u> <u>Demore</u>, 538 U.S. at 578 (Breyer, J., dissenting) (suggesting "bail standards from the criminal justice system" should be focus of IJ's attention); <u>see also</u> <u>Diop v. ICE/Homeland Sec.</u>, 656 F.3d 221, 231 n.8 (3d Cir. 2011) (noting that "at least one circuit judge has expressed grave doubts about whether <u>Joseph</u> is consistent with due process of law") (citing <u>Tijani v. Willis</u>, 430 F.3d 1241, 1244 (9th Cir. 2005) (Tashima, J., concurring)). Using a <u>Joseph</u> hearing as a substitute for an individualized bond hearing is particularly problematic not only because the relevant inquiry differs, but because the standard is "all but insurmountable" to the individual, and does not take into account potential defenses to removal. <u>See</u> <u>Tijani</u>, 430 F.3d at 1245-47 (Tashima, J., concurring). It should come as no surprise that most <u>Joseph</u> hearings are resolved in favor of the Government. <u>See</u> Julie Dona, <u>Making Sense of "Substantially Unlikely": An Empirical Analysis of the Joseph Standard in Mandatory Detention Custody Hearings</u>, 26 Geo. Immigr. L.J. 65, 72 (2011) (concluding that ninety percent of <u>Joseph</u> hearing appeals result in continued detention). Given the enormous individual liberty interests at stake, a holding that a <u>Joseph</u> hearing suffices in lieu of an individualized bond hearing would result in an unacceptably high risk of erroneous detention, even while giving due consideration to the Government's undoubtedly weighty interest in regulating immigration. <u>Id.</u> at 90-91; <u>see</u> <u>Tijani</u>, 430 F.3d at 1247 (Tashima, J., concurring) (rejecting <u>Joseph</u> standard for more deferential standard).

unreasonably prolonged. From day one, Jaimes's civil immigration detention has exceeded the criminal incarceration underlying the Government's charge of removability, for which Jaimes received probationary sentences only. See Ly, 351 F.3d at 271. Indeed, his detention now exceeds the nine-month mark in Chavez-Alvarez that "strain[ed] any common-sense definition of a limited or brief civil detention." 783 F.3d at 477.

The government attempts to assign responsibility for the delay in proceedings to Jaimes, citing several cases from this Circuit wherein a noncitizen's appeal of his case undermined the claim that his prolonged detention was unreasonable. See Hylton v. Shanahan, No. 15-CV-1243 (LTS), 2015 WL 3604328, at *4-*6 (S.D.N.Y. June 9, 2015); Baker v. Johnson, No. 14-CV-9500 (LAP), 2015 WL 2359251, at *13 (S.D.N.Y. May 15, 2015); Debel v. Dubois, No. 13-CV-6028 (LTS) (JLC), 2014 WL 1689042, at *6 (S.D.N.Y. Apr. 24, 2014); Orsino, 942 F. Supp. 2d at 408-11. But these cases were already in the appeal stage of their proceedings, whereas Jaimes's proceedings, relatively speaking, have just begun. His case—and detention—could continue for a significant additional period of time. As Jaimes's counsel has averred, his next hearing quite possibly won't be the last one before the IJ, not only due to backlogs and the new videoconferencing procedures at the Varick Street court, but in light of the extensive evidence and argument that Jaimes has every right to present. Moreover, the IJ's first adjournment for a lack of readiness indicates future adjournments may be forthcoming. Should Jaimes receive an order of removal on July 27 or at a subsequent hearing, he has the right to appeal first to the BIA and then to the Second Circuit. During that time, he would continue to be detained. As such, the likelihood of an imminent final removal order is diminishing exponentially, along with the government's interest in continued detention without an individualized bond hearing. Reid, 819 F.3d at 499-500.

Though two cases cited by the Government dealt with respondents seeking relief from removal, unlike Jaimes those respondents do not appear to have contested their removability as well, thus reducing the likelihood of prolonged appeals and detention. Young v. Aviles, 99 F. Supp. 3d 443, 453-54 (S.D.N.Y. 2015); Adler v. U.S. Dep't of Homeland Sec., No. 09-CV-4093 (SAS), 2009 WL 3029328, at *2 (S.D.N.Y. Sept. 22, 2009).

In any event, pursuit of relief from removal does not, in itself, undermine a claim that detention is unreasonably prolonged. The government cites to Doherty v. Thornburgh, 943 F.2d 204 (2d Cir. 1991) for the proposition that a noncitizen "may not rely on the extra time resulting [from pursuit of legal remedies] to claim that his prolonged detention violates substantive due process." Id. at 211. But the petitioner's continued detention in Doherty was valid because he had received a bond hearing and been deemed "an exceptionally poor bail risk." Id. Doherty thus supports rather than undermines Jaimes's argument.

Indeed, the mere fact that a noncitizen opposes his removal is insufficient to defeat a finding of unreasonably prolonged detention, especially where the Government fails to distinguish between bona fide and frivolous arguments in opposition. The government's failure to parse Jaimes's arguments overlooks a key part of a fact-dependent inquiry. See, e.g., Chavez-Alvarez, 783 F.3d at 477 (noting that while the respondent "undoubtedly is responsible for choosing to challenge his removal by raising complicated issues that have taken a lot of time to argue and decide . . . this does not undermine his ability to claim that his detention is unreasonable."); cf. Gordon, 2015 WL 1176706, at *5 ("Moreover, it would be unreasonable to penalize Mr. Gordon for exercising his right to challenge removal by requiring him to be detained while he exercises that right . . . ."). That analysis is unmentioned in all of the Government's cited cases save one, where meritless arguments counted against the noncitizen. Orsino, 942 F. Supp. 2d at 411 (noting

that the petitioner "has made no showing that his appeal to the BIA has merit").

Without expressing an opinion as to the ultimate merits of Jaimes's arguments in his removal proceedings, for purposes of his habeas claim the Court notes that they are not frivolous. See Hyppolite v. Enzer, No. 3:07cv729 (JBA), 2007 WL 1794096, at *1 (D. Conn. June 19, 2007) ("While petitioner is not certain to receive the relief of cancellation of removal which he seeks before the Executive Office of Immigration Review, he appears reasonably likely to receive such relief in light of the equities evidenced in the undisputed documents presented to this Court."). Speaking first to relief from removal, Jaimes is a 39-year-old father with a long-time partner and family consisting of seven U.S. citizen biological children. Although he does not live with all of his children, he has taken an active role in each of their upbringings, escorting them to school each day and participating in the parents' association at their schools. As a result of Jaimes's detention, his children have suffered a number of medical and psychological issues, as well as setbacks in their schooling. Before he was detained, Jaimes and his family were very active in their church community. A steady job at a pizzeria enabled him to provide meaningful financial support not only for his family in the United States, but for his ailing father in Mexico, who has been cut off from his necessary medication as a result of Jaimes's detention. Jaimes himself suffers from health issues, including diabetes and arthritis. The three convictions for non-violent offenses that may render him deportable all occurred in a brief period in 2003, and his criminal record since then is almost nonexistent. Jaimes has also submitted an asylum application which remains pending, asserting that he has received death threats from his ex-girlfriend's brother, who Jaimes claims is a gang member. Pet. Ex. 4 at 5-6. If Jaimes's applications for relief are denied, he also has nonfrivolous legal arguments on appeal that he is not removable as charged.[8]

---

[8] Jaimes also points to Second Circuit case law in support of his nonfrivolous argument that he is not removable as charged. See Prus v. Holder, 660 F.3d 144 (2d Cir. 2011) ("In sum, whatever uncertainty may exist about the precise

In short, the delay in Jaimes's removal proceedings cannot fairly be attributed to him. If anything, he has attempted to speed things along by making timely and early applications for the relief that he seeks before the IJ. Granted such applications have been numerous, but there is no record evidence of adjournment requests or other bad-faith delay on his part. In contrast, there is some evidence of government delay. It took over one month for Jaimes's initial appearance to take place, and when Jaimes appeared for his merits hearing before the IJ, the IJ was not ready and adjourned the matter nearly two months. In pointing to this evidence, the Court does not assume that delay was intentional or in bad faith, bearing in mind that even innocent, reasonable errors may collectively result in unreasonable detention. See Diop, 656 F.3d at 223.

Finally, the Government has failed to justify Jaimes's continued detention without an individualized hearing, much less in a penal institution in New Jersey, where he is subject to "identical" conditions as individuals held in criminal custody. The purpose of Section 1226(c) is to "prevent[] deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed." Demore, 538 U.S. at 528. Other courts have noted an additional purpose of preventing danger to the community. Diop, 656 F.3d at 231. The available evidence on this habeas petition, uncontested, indicates that Jaimes has substantial incentives not to flee his removal proceedings. Victory may allow him to remain in the United States, in the community he has known his entire adult life, alongside his partner and U.S. citizen children, continuing to support them and his ailing father in Mexico. Flight would result in an in absentia order of removal that would bar him those benefits. Similarly, no record facts indicate that he would be a danger to his community. Jaimes's

---

contours of the New York definition of 'prostitution,' it is evident that the law encompasses a broader range of sexual activity than the 'sexual intercourse' that is the sole subject of the definition applicable in the immigration context."). He also intends to call three experts at his merits hearing in support of this argument. Charniauskaya Decl. ¶ 5 & Ex. A.

convictions were for nonviolent offenses. To the extent that his criminal sentences reflect the state's judgment of his dangerousness, that Jaimes received no term of incarceration for any of the offenses is notable. The parties have provided no indication that Jaimes was unable to successfully complete the terms of supervised release imposed in these underlying cases. Accordingly, on the limited record before the Court, the Government's interests in Jaimes's continued detention without a bond hearing appear slight. That said, the Court expresses no opinion as to whether Jaimes ultimately should receive bond; other facts not presented here may weigh on that determination.

In sum, the relevant factors all point to the conclusion that Jaimes's unreasonably prolonged detention without a bond hearing violates the Fifth Amendment's Due Process Clause. Because "the Due Process Clause prohibits arbitrary deprivations of liberty," Jaimes, after "unreasonable delay by the [DHS] in pursuing and completing deportation proceedings," is "entitled to an individualized determination as to his risk of flight and dangerousness." Demore, 538 U.S. at 532 (Kennedy, J. concurring).

### e. Procedural Requirements of Bond Hearing

Jaimes further argues that due process requires that, at his individualized bond hearing, the Government demonstrate dangerousness or risk of flight by clear and convincing evidence, and that, in determining bond, the IJ must consider his ability to pay. The Court agrees.

In Lora, the Second Circuit adopted the Ninth Circuit's procedural requirements for an individualized bond hearing pursuant to Section 1226(c), requiring that "the government establish[] by clear and convincing evidence that the immigrant poses a risk of flight or a risk of danger to the community." Lora, 804 F.3d at 616 (citing Rodriguez, 715 F.3d at 1131). Though both Lora and Rodriguez were statutory holdings, Rodriguez derived its standard from Singh v.

Holder, 638 F.3d 1196 (9th Cir. 2011), in which the Ninth Circuit conducted the most extensive

constitutional analysis on this question that this Court has been able to locate, and concluded that,

with respect to a discretionary bond hearing held pursuant to Section 1226(a), the Due Process

Clause requires that the government demonstrate that the individual is a risk of flight or danger to

the community under a clear and convincing standard. Singh, 638 F.3d at 1203.[9] In so holding,

the Singh Court observed that the "Supreme Court has repeatedly reaffirmed the principle that 'due

process places a heightened burden of proof on the State in civil proceedings in which the

'individual interests at stake ... are both particularly important and more substantial than mere loss

of money.'" 638 F.3d at 1204 (quoting Cooper v. Oklahoma, 517 U.S. 348, 363 (1996)).

The Government argues that the Supreme Court "squarely rejected" Singh when it held in

Jennings that the Ninth Circuit's application of the doctrine of constitutional avoidance was

erroneous. Gov't Br. at 28. Further, the Jennings dissent acknowledged that bond hearings

"should take place in accordance with customary rules of procedure and burdens of proof rather

than the special rules that the Ninth Circuit imposed." Id. at 882 (Breyer, J., dissenting).[10]

However, because the Jennings majority and dissent were focused on whether the statutes

required bond hearings, declining to reach the constitutional question at issue here, the Court is

unpersuaded that Jennings has any bearing on the appropriate procedures consistent with due

process. See, e.g., Portillo v. Hott, No. 118CV470LMBMSN, 2018 WL 3237898, at *8 n.9 (E.D.

---

[9] Though Lora and Rodriguez addressed the mandatory detention context of Section 1226(c), Singh did not. However, as the Government notes, this was because the Ninth Circuit's approach was for detention authority automatically to shift after six months of detention from Section 1226(c) to Section 1226(a). Gov't Br. at 28 n.7 (citing Jennings, 138 S. Ct. at 839). Neither party makes an argument as to why the due process analysis should differ depending on the statutory context, and the Court cannot discern one. See Singh, 638 F.3d at 1205 (discussing how, despite different nature of removal proceedings, liberty interest is much the same); see also Brevil v. Jones, 283 F. Supp. 3d 205, 214 (S.D.N.Y. 2018) (reasoning that Second Circuit's adoption of Rodriguez in Lora suggests that it was "highly unlikely that the Second Circuit would disagree with affording" Section 1226(a) and Section 1226(c) detainees different protections) (quoting Nguti v. Sessions, 259 F. Supp. 3d 6, 9 (W.D.N.Y. 2017)).

[10] At present, in a custody redetermination hearing under Section 1226(a), "[t]he burden is on the alien to show to the satisfaction of the [IJ] that he or she merits release on bond." Matter of Guerra, 24 I. & N. Dec. 37, 40 (BIA 2006).

21

Va. July 3, 2018) (holding that <u>Jennings</u> is inapposite to this question, as a court "must determine what protections are demanded by the Constitution, not what protections are authorized by the statute."); <u>Cortez v. Sessions</u>, No. 18-CV-01014-DMR, 2018 WL 1510187, at *9 (N.D. Cal. Mar. 27, 2018) (same). As alluded to above, <u>supra</u> n.9, the <u>Singh</u> Court's analysis was not moored to any specific immigration statute (or subsection thereof), but rather a more generic due process analysis upon which <u>Jennings</u> has no apparent bearing. The government cites to no other case purporting to undermine the logic of <u>Singh</u>, which was implicitly adopted by the Second Circuit in <u>Lora</u>, or any other positive authority requiring a different standard.

As such, the Court concludes, pursuant to <u>Lora</u>, that imposing a clear and convincing standard would be most consistent with due process. <u>See, e.g.</u>, <u>Argueta Anariba v. Shanahan</u>, No. 16-CV-1928 (KBF), 2017 WL 3172765, at *4 (S.D.N.Y. July 26, 2017) (reading <u>Lora</u> to require this standard to be consistent with constitutional due process); <u>Frantz C. v. Shanahan</u>, No. CV 18-2043 (JLL), 2018 WL 3302998, at *3 (D.N.J. July 5, 2018) (assuming without deciding that clear and convincing standard from <u>Lora</u> survived despite vacatur of <u>Lora</u>).[11] The mere possibility of removal does not meaningfully distinguish immigration detention from other types of civil commitment, because "civil commitment for <u>any</u> purpose constitutes a significant deprivation of liberty." <u>Singh</u>, 638 F.3d at 1204 (quoting <u>Addington v. Texas</u>, 441 U.S. 418, 425 (1979)) (emphasis added). The <u>Jennings</u> Court did nothing to undermine this bedrock principle of procedural due process.

In so holding, the Court is mindful that some district courts have come to different conclusions, citing language in <u>Demore</u> that "when the Government deals with deportable aliens,

---

[11] Though Jaimes argues that Judge Nathan found this "approach . . . most appropriate" in <u>Sajous</u>, he neglects to mention that Judge Nathan, though referencing a number of cases that supported the Petitioner's argument in passing, ultimately declined to reach the merits of this argument, holding that the Government waived it. 2018 WL 2357266, at *12. As such, <u>Sajous</u> is not persuasive on this point.

the Due Process Clause does not require it to employ the least burdensome means to accomplish its goal." E.g., Pensamiento v. McDonald, No. CV 18-10475-PBS, 2018 WL 2305667, at *6 (D. Mass. May 21, 2018) (quoting Demore, 538 U.S. at 528, 531) (suggesting that, in a Section 1226(a) bond proceeding, the Government should bear the burden of proof to the satisfaction of the IJ, rather than by clear and convincing evidence, to be consistent with due process). However, as the Court of Appeals has emphasized, a core component of the holding in Demore was the "brief period[s]" of detention at issue. Lora, 804 F.3d at 614 (surveying cases suggesting that Demore was so limited); Demore, 538 U.S. at 513, 523. The country has seen a "dramatic increase" in the average length of detention since Demore, Sopo, 825 F.3d at 1213, and, as discussed at length above, Jaimes faces a much more significant term of detention than was at issue in Demore, thus enhancing his individual liberty interest and warranting additional procedural safeguards. Rodriguez, 804 F.3d at 1088 (quoting, inter alia, Mathews, 424 U.S. at 335). Moreover, simply requiring that IJs impose a more exacting standard on government attorneys does not equate to requiring that IJs "employ the least burdensome means" to ensuring an individual returns to court, as it still affords the IJ some discretion in his or her determination. Id. (rejecting similar argument). As such, after due consideration of Lora and the other available authorities on this question, as well as the facts of this case, the Court concludes that due process requires that the Government demonstrate dangerousness or risk of flight by a clear and convincing standard at Jaimes's bond hearing.

Additionally, Jaimes argues that due process requires consideration of alternatives to detention and his ability to pay bond. In response, the Government contends that the Court should defer to the BIA's guidance for IJs presiding over bond hearings, which provides that IJs may consider a limitless number of discretionary factors. Gov't Br. at 28-29 (citing Guerra, 24 I. & N.

Dec. at 40; Matter of Urena, 25 I. & N. Dec. 140, 141 (BIA 2009)). However, even if such agency guidance could define the boundaries of what due process requires (it cannot), as one district judge within this Circuit has concluded when faced with a virtually indistinguishable argument, these BIA cases actually undermine the Government's argument. Abdi v. Nielsen, 287 F. Supp. 3d 327, 337-38 (W.D.N.Y. 2018). Because Guerra requires that an IJ set an "amount of bond that is appropriate[,]" 24 I. & N. Dec. at 40, and Urena requires the IJ set "the amount of bond necessary to ensure the [individual's] presence at proceedings[,]" 25 I. & N. Dec. at 141-42, consideration of ability to pay and alternatives to detention appears to be compelled by BIA case law. Abdi, 287 F. Supp. 3d at 338.

More important, however, the Constitution compels it as well. At least one circuit court of appeals has held as much, Hernandez v. Sessions, 872 F.3d 976 (9th Cir. 2017), concluding that "[a] bond determination that does not include consideration of financial circumstances and alternative release conditions is unlikely to result in a bond amount that is reasonably related to the government's legitimate interests." Id. at 991 & n.4. The Hernandez Court reasoned that because the Government's purpose in making release contingent upon posting bond is to "provide enough incentive" for detainees to appear at a future proceeding, refusing to consider financial circumstances would be inexplicable, as the amount likely to secure the appearance of an indigent person "obviously differs from the amount" necessary to secure the appearance of a wealthy person. Id.; see id. at 993-94 (applying Mathews v. Eldridge balancing test to arrive at this conclusion). Considering this rationale, combined with the logic of Lora (which remains persuasive authority in this Circuit, Sajous, 2018 WL 2357266, at *7), the Abdi court concluded that the Due Process Clause "require[s]" than an IJ consider ability to pay and alternative conditions of release in setting bond. See 287 F. Supp. 3d at 338-39 (reasoning that setting bond

outside the reach of an individual's ability to pay it "amounts, for all practical purposes, to a denial of bond").

Thus, to the extent that existing BIA precedent does not require that Jaimes's IJ consider such factors, I concur that the Due Process Clause does.

### III. Conclusion

For the foregoing reasons, Jose Miguel Jaimes Hernandez's detention without a bond hearing was unreasonably prolonged when he brought his habeas petition and continues to be so. Respondents are ordered to provide him with a bond hearing consistent with the above-stated procedural requirements within seven days of this order. The Clerk of Court is requested to enter judgment accordingly and close this case.

**SO ORDERED.**

**Dated:**  **July 25, 2018**
**New York, New York**

_____
**ANDREW L. CARTER, JR.**
**United States District Judge**